**David O. WARNER, et al., Plaintiffs,**

v.

**ATKINSON FREIGHT LINES CORP., Defendant.**

**No. 04–CV–123–P–S.**

United States District Court,
D. Maine.

Nov. 1, 2004.

---

Charles W. March, Reben, Benjamin, & March, Portland, OR, for David O. Warner, William D. Freeman, Daniel S. McLaughlin, Roger L. Lehouillier.

Paul McDonald, Bernstein, Shur, Sawyer, & Nelson, Portland, OR, for Atkinson Freight Lines Corporation.

## ORDER ON PLAINTIFFS' MOTION TO REMAND AND DEFENDANT'S MOTION TO DISMISS

SINGAL, Chief Judge.

Before the Court is Plaintiffs' Motion to Remand (Docket # 7) for lack of federal subject matter jurisdiction and Defendant's Motion to Dismiss (Docket # 5) for failure to state a claim for which relief can be granted. These motions require the Court to consider first whether Plaintiffs' state law claims against their former employer for failure to pay wages, conversion, breach of fiduciary duty, and fraud must be recharacterized as stating a federal question under either section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, or section 502(a) of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a). If the Court finds such a federal question, it must go on to determine whether these claims are in fact preempted by either section 301 of the LMRA, 29 U.S.C. § 185, or section 502(a) of ERISA, 29 U.S.C. § 1132(a). Finally, the Court must determine whether Plaintiffs' fraud claim is pled "with particularity" as required by Fed.R.Civ.P. 9(b).

For the reasons set forth below, the Court DENIES Plaintiffs' Motion to Remand and GRANTS IN PART and DENIES IN PART Defendant's Motion to Dismiss.

## I. FACTUAL BACKGROUND

In order to lay out the factual background below, the Court has reviewed and considered the allegations contained in Plaintiffs' Complaint (Ex. 2 to Docket # 1). In addition, the Court has considered the Collective Bargaining Agreement ("CBA") submitted by Defendants for purposes of deciding both the Motion to Dismiss and the Motion to Remand as a document integral to Plaintiffs' Complaint. *See Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 32 (1st Cir.2000) (holding that, in considering a motion to dismiss, a court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"). Finally, the Court notes that in connection with the pending motions both Plaintiffs and Defendant have filed additional affidavits and other supporting exhibits. The Court has considered these affidavits in the course of determining whether removal was proper. *See Davis v. Cluet, Peabody & Co.*, 667 F.2d 1371, 1373 (11th Cir.1982) (holding that the Court may consider the entire record before it in determining whether removal was proper); *see also Parker v. County of Oxford*, 224 F.Supp.2d 292, 294 (D.Me.2002) (noting that affidavits, among other papers, can provide a party with grounds for removal under 28 U.S.C. § 1446(b)). However, in connection with Defendant's Motion to Dismiss, the Court has limited itself to the facts that may be drawn from Plaintiffs' Complaint and the CBA. *See* Fed.R.Civ.P. 12(b) (requiring the Court to exclude materials outside the pleadings unless the motion is converted to a motion for summary judgment).

Plaintiffs are four former employees of defendant Atkinson Freight Lines ("AFL"). They are suing AFL for conversion, fraud, breach of fiduciary duty, and failure to pay wages under the Maine Wage Payment Statutes, 26 M.R.S.A.

§ 626–A. Their claims arise from AFL's aborted attempt to create an Employee Stock Ownership Plan ("ESOP") for its employees during Plaintiffs' employment. According to Plaintiffs' submissions, AFL and Plaintiffs' union, Teamsters Union Local No. 340 ("the Union"), agreed to create an ESOP in "about 1999." (Turkewitz Aff. (Ex. 2 to Docket #7) ¶3.) On August 9, 2000 the President of AFL "delivered a proposal" for the ESOP "whereby the company's employees could buy into the stock plan by contributing 4% of their weekly pay, which would go towards funding the plan" (Compl.¶8.) AFL also began withholding four percent of Plaintiffs' weekly earnings around this time, which it placed in an escrow account pending the creation of the ESOP. (Compl.¶10.) It is not clear from the parties' submissions why AFL began collecting money from the employees before the plan itself was established.

On November 16, 2000 the Union agreed to a CBA that called for the creation of the ESOP. (McDonald Aff. (Docket #6), Ex. A, at 18.) Specifically, Article 43 of the CBA states:

> The Employer and the Union will enter in to an agreement to establish and implement the Atkinson Freight Lines Stock Plan that will enable all employees to receive a majority equity interest in the company.

(*Id.*) The only other reference to the ESOP in the CBA is in the Grievance and Arbitration Procedure. Article 20 of the CBA states that "[a]ny dispute concerning the Atkinson Freight Lines Stock Plan are [sic] not subject to resolution through [the arbitration] procedure. Such disputes are to be resolved in accordance with the procedures of that plan." (McDonald Aff., Ex. A at 7.)

AFL continued withholding four percent of its employees' earnings until December of 2002, although "[t]he ESOP was never finalized or created as a matter of law." (Compl.¶¶11–12.) Indeed, the company announced in June of 2002 that the ESOP had been "cancelled" and that "the company would return to the employees all monies that they had paid in as of December 31, 2002." (Compl.¶12.) The company followed through on its promise in June 2003, reimbursing its current employees. (Compl.¶13.) However, Plaintiffs, who were no longer actively employed by Defendant in June 2003, received nothing from AFL. (*Id.*) According to the Business Agent for the Union, "AFL management and the Union could not resolve the matter of refunding wages due to those truck drivers who were not actively employed at that time, including the Plaintiffs, ... because these people were no longer employed at AFL.... [T]he Union had no authority to grieve or arbitrate [Plaintiffs'] claims." (Turkewitz Aff. ¶7, 8.)

Plaintiffs' counsel wrote to Defendant, "attempting to invoke terms of the ESOP's proposed language to secure the wages that were not refunded to the Plaintiff." (March Aff. (Ex. 1 to Docket #7) ¶7.) Defendant's counsel wrote back stating that AFL never adopted an ESOP or an associated Employee Stock Ownership Trust .... There is, therefore, "no plan 'governed by ERISA,' and there are no 'plan participants.'" (March Aff., Ex. B.)

Plaintiffs subsequently brought this suit alleging failure to pay wages, conversion, breach of fiduciary duties, and fraud. They request an accounting in order to determine the amount of wages withheld and damages pursuant to Maine law.

## II. DISCUSSION

Shortly after removing the present action from state court, Defendant filed the pending Motion to Dismiss, which argues that Plaintiffs' claims are in fact preempt-

ed by federal law. It also argues that Plaintiffs' claim for fraud was not plead "with particularity" as required by Fed. R.Civ.P. 9(b). For their part, Plaintiffs responded to Defendant's Notice of Removal by filing a timely motion to remand challenging this Court's subject matter jurisdiction.

## A. Motion to Remand

■ Subject matter jurisdiction is a threshold issue where removal from state court is contested. *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir.1999). Hence, the Court must first address Plaintiffs' Motion to Remand. In defending against a motion to remand, the removing party must show that "the federal district court would have had original jurisdiction of the case had it been filed in that court." *BIW Deceived v. Local 56*, 132 F.3d 824, 830 (1st Cir.1997) (citing *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 702, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972)). To meet its burden of proof, the removing party must make a "colorable" showing of the underlying jurisdictional basis for removal. *Danca*, 185 F.3d at 4.

Defendant removed this case to federal court on the basis of both federal question and diversity jurisdiction. (Notice of Removal (Docket # 1) ¶ 16.) As Defendant acknowledges, federal question jurisdiction can only be established by recharacterizing Plaintiff's claims as falling under either section 301 of the LMRA or section 514(a) of ERISA. Below, the Court discusses

whether it is appropriate to undertake such a recharacterization of the Plaintiff's claims.[1]

## 1. Complete Preemption and the Artful Pleading Doctrine

■ "The gates of federal question jurisdiction are customarily patrolled by a steely-eyed sentry—the 'well-pleaded complaint rule.'" *BIW Deceived*, 132 F.3d at 831. Under this rule, federal question jurisdiction "must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Thus, "a federal defense does not confer [federal question] jurisdiction, ... even where the asserted defense is the preemptive effect of a federal statute." *Ten Taxpayer Citizens Group v. Cape Wind Assocs.*, 373 F.3d 183, 191 (1st Cir.2004).

■ While a defendant cannot "inject[ ] a federal question into an action that asserts what is plainly a state-law claim" in order to establish federal jurisdiction, *Caterpillar v. Williams*, 482 U.S. 386, 399, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), the well-pleaded complaint rule is not without its exceptions. The complete preemption doctrine, an "independent corollary" to the well-pleaded complaint rule, can "convert[ ] an ordinary state common law complaint into one stating a federal claim."

---

1. Defendant has not controverted Plaintiffs' assertions and supporting evidence that the amount in controversy in this case is less than $75,000. (*See* Mot. to Remand; Marsh Aff. ¶ 10, Ex. A; Mem. of Law in Opp'n to Pls.' Mot. to Remand (Docket # 11).) Defendant bears the burden of establishing that the amount in controversy is above $75,000. *See Satterfield v. F.W. Webb, Inc.*, 334 F.Supp.2d

1, 2 (D.Me.2004). Hence, Defendant must make some showing that Plaintiffs' assertions regarding the amount in controversy are incorrect in order to establish diversity jurisdiction. Since it has failed to do so, the Court finds that Defendant has failed to meet its burden with regard to amount in controversy and concludes there is no basis for asserting diversity jurisdiction.

*Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 65, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Complete preemption occurs when Congress "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Id.* at 63–64, 107 S.Ct. 1542. If a complaint asserts a state law claim pertaining to an area of law that has been completely preempted, "any such suit must be regarded as purely a creature of federal law." *BIW Deceived,* 132 F.3d at 831.

■ Complete preemption "propels a significant exception to the well-pleaded complaint rule—the artful pleading doctrine." *BIW Deceived,* 132 F.3d at 831. Under the artful pleading doctrine, the court must "look beneath the face of the complaint" in order to determine whether complete preemption renders a plaintiff's claims truly federal in nature. *Id.* If the court so finds, it must "recharacterize the complaint to reflect that reality and affirm the removal despite the plaintiff's professed intent to pursue only state-law claims." *Id.*

On its face, Plaintiffs' Complaint sounds only in state law. Defendant argues, however, that Plaintiffs' claims amount to artful pleadings and, in fact, implicate both section 301 of the LMRA and section 502 of ERISA. Both of these statutes have been found by the Supreme Court to completely preempt related state-law claims. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (finding that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law."); *Aetna Health Inc. v. Davila,* —— U.S. ——, 124 S.Ct. 2488, 2495, 159 L.Ed.2d 312 (2004) (noting that complete preemption applies to "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy"). AFL argues that since complete preemption requires the Court to construe Plaintiffs' claims as raising federal questions, this Court has original jurisdiction under 28 U.S.C. § 1331 and therefore should deny Plaintiffs' motion to remand. The Court agrees.

**2. Preemption Under Section 301 of the Labor Management Relations Act**

Section 301 of the LMRA empowers federal courts to hear disputes between unions and employers over contract violations.[2] While seemingly modest in scope, the Supreme Court has interpreted this provision as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis–Chalmers Corp.,* 471 U.S. at 209, 105 S.Ct. 1904.

■ Preemption of state laws that threaten to interfere with federal regulation of labor relations is a key aspect of the Supreme Court's section 301 jurisprudence. "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Allis–Chalmers Corp.,* 471 U.S. at 209–10, 105 S.Ct. 1904. Uniform federal rules governing the interpretation of CBAs are necessary because

---

**2.** Section 301 states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185.

"the possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Hence, the Supreme Court has found that state law is preempted both in actions to enforce collective bargaining agreements, *see id.*, and in any actions that "require construing the collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

▇▇▇ Section 301 is perhaps the paradigmatic example of complete preemption. *See Caterpillar*, 482 U.S. at 393, 107 S.Ct. 2425 ("The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims preempted by section 301 of the LMRA."). Since "the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and labor organization," *Franchise Tax Bd.*, 463 U.S. at 23, 103 S.Ct. 2841, a plaintiff's claim is construed as federal in nature if its resolution "depends upon the meaning of a collective-bargaining agreement" or "requires construing the collective-bargaining agreement." *Lingle*, 486 U.S. at 405–407, 108 S.Ct. 1877.

▇▇▇ Following *Lingle's* holding the First Circuit has identified two specific categories of claims that can be said to depend on interpretation of CBAs. *See Flibotte v. Penn. Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir.1997). First, claims that allege conduct "that arguably constitutes a breach of a duty that arises pursuant to a collective bargaining agreement" are preempted. *Id.* (citing *United Steelworkers v. Rawson*, 495 U.S. 362, 369, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990)). Thus, if the duty allegedly breached by the defendant is "without existence independent of the agreement," the plaintiff's claim depends on the meaning of the CBA and is preempted. *Rawson*, 495 U.S. at 369, 110 S.Ct. 1904. Second, claims are preempted if their "resolution arguably hinges upon an interpretation of the collective bargaining agreement." *Flibotte*, 131 F.3d at 26 (citing *Allis–Chalmers Corp.*, 471 U.S. at 220, 105 S.Ct. 1904). The First Circuit also noted, however, that "purely factual questions about an employee's conduct or an employer's conduct and motives" do not depend upon the meaning of the CBA for preemption purposes. *Id.* (quoting *Hawaiian Airlines, Inc. v. Norris* 512 U.S. 246, 262, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). Nor does section 301 extend to "nonnegotiable rights conferred on individual employees as a matter of state law." *Id.* (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 123, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).

Although there is much case law on the scope of section 301 preemption, the Supreme Court has noted that "the full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." *Allis–Chalmers Corp.*, 471 U.S. at 220, 105 S.Ct. 1904. In applying section 301, courts have found a wide variety of state law claims to be preempted when the CBA is potentially central to the resolution of the claim,[3]

---

**3.** *See, e.g., Fant v. New England Power*, 239 F.3d 8, 16 (1st Cir.2001) (holding that a claim by an injured employee for disability discrimination due to his employer's alleged refusal to rehire him was preempted because the CBA set forth the procedure for laying off and rehiring workers); *Flibotte*, 131 F.3d at 28 (holding that plaintiff's claims for wrongful discharge and related torts were preempted because his discharge was based on his refus-

while often refusing to find preemption in cases where the CBA plays only a minor role.[4]

### 3. The Standard For Finding Complete Preemption Under Section 301

Although it is tempting to understand the complete preemption doctrine as compressing the analysis of jurisdiction and preemption into one step, the First Circuit has made it clear that the standard for finding that a plaintiff's putative state law claims raise federal questions under the complete preemption doctrine is lower than the standard for finding that the claims are, in fact, preempted.

In *BIW Deceived*, the First Circuit established "colorability" as the litmus test for determining whether a plaintiff's ostensibly state law claims should be found to raise a federal question under the complete preemption doctrine:

the artful pleading doctrine permits a district court to recharacterize a putative state-law claim as a federal claim

when a review of the complaint, taken in context, reveals a colorable federal question within a field in which state law is completely preempted.

132 F.3d at 832. The plaintiffs in *BIW Deceived* sued their union for inducing them into accepting employment with Bath Iron Works by falsely representing in job interviews that the positions with BIW were long term in nature. Specifically, plaintiffs asserted state law claims of negligence, fraudulent misrepresentation, fraud in the inducement, infliction of emotional distress, loss of consortium, intentional nondisclosure, and unjust enrichment. *Id.* at 827. The claims were brought in state court and removed by the union to federal district court on the basis of complete preemption. Plaintiffs lost their motion to remand and subsequently moved for final judgment "specifically abandoning any and all federal claims" so as to challenge the district court's finding of subject matter jurisdiction. *Id.* at 828.

The First Circuit explained that the district court's ruling that the plaintiffs'

---

al to submit to a drug test, an obligation set forth in the CBA); *Martin v. Shaw's Supermarkets*, 105 F.3d 40, 42–43 (1st Cir.1997) (finding plaintiff's claims under a Massachusetts law requiring his former company to reinstate him with seniority rights after recovering from an injury to be preempted because the law in question by its own terms was applicable only if it did not conflict with the terms of a CBA); *Quesnel v. Prudential Ins. Co.*, 66 F.3d 8, 11 (1st Cir.1995) (finding that an employee's claim that he was discharged by his employer for the purpose of denying him his earned sales commissions was preempted because the CBA set forth grievance procedures for wrongful termination).

4. *See, e.g., Livadas*, 512 U.S. at 125, 114 S.Ct. 2068 (holding that section 301 did not preempt a California law imposing liability for untimely payment of an employee's wages since the CBA was only relevant for the purpose of computing damages); *Lingle*, 486 U.S. at 407, 108 S.Ct. 1877 (finding that a plaintiff's claim under a Massachusetts law prohib-

iting employers from discharging employees in retaliation for filing a worker's compensation claim did not raise a preemption issue because the inquiry into an employer's motives for the discharge was purely factual in nature); *In re Carleton Woolen Mills, Inc.*, 281 B.R. 409, 411 (D.Me.2002) (finding that Maine's Severance Pay Statute, which requires employers to make a one-time severance payment to laid-off employees, was a non-negotiable minimum labor standard that could not be waived by a CBA and therefore was not preempted even when the laid-off employees were subject to a CBA); *Rand v. BIW Corp.*, 2001 WL 127655, *5, 2001 U.S. Dist. LEXIS 23164, *16–17 (D.Me. Feb. 15, 2001) (finding that plaintiffs' breach of contract and fraudulent misrepresentation claims against their employer for assuring them of long-term employment only to lay them off after four months was not preempted under section 301 because there was no disagreement between the parties that CBA permitted the employer to lay off the employees at will).

claims raised a federal question under section 301 "did not require a finding of preemption; it only required a finding that the Union had made a colorable showing of federal jurisdiction." *Id.* In upholding the district court's ruling on jurisdiction, the appeals court held that it was proper for the district court to find a colorable section 301 claim even though the CBA itself was not part of the record: "It is plausible (indeed, likely) that the CBA details the nature and limits of the Union's participation in the interview process and that the Union, therefore, would have had a duty of care separate from any duty owed by third parties." *Id.* at 833.

*BIW Deceived* suggests that the fact that a state law claim raises a colorable federal claim under section 301 does not, by itself, require the court to find the state law claim to be preempted. A plaintiff may be forced to abandon her state law claims if an expanded record reveals that interpretation of the CBA will indeed be necessary to resolve all of the claims. However, *BIW Deceived's* "colorability" test requires only that it be "plausible" that the resolution of the claim depends upon the meaning of a collective bargaining agreement. An actual finding of preemption, in contrast, requires more than plausible connection to the CBA—it must be clear to the court that the CBA will in fact become an issue in the case.[5]

Using "colorability" as the litmus test for federal jurisdiction under the complete preemption doctrine not only follows the clear holding of *BIW Deceived,* but it also comports with the policy goals underlying the LMRA. In enacting the LMRA, Congress intended to provide the federal courts with authority to craft substantive law to resolve disputes over collective bargaining agreements. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 209, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Although state courts have concurrent jurisdiction over section 301 claims, *see Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), Congress's grant of law-making authority to the federal courts strongly suggests that it intended federal courts to have expansive jurisdiction over claims implicating the LMRA since federal courts are clearly best equipped to resolve questions of federal common law. In addition, expansive jurisdiction for federal courts helps to further the LMRA's important goal of ensuring uniform interpretation of CBAs. *See Lucas Flour Co.,* 369 U.S. at 103, 82 S.Ct. 571 ("the subject matter of § 301(a) is peculiarly one that calls for uniform law"). Federal courts are likely to be especially sensitive to the need for uniformity. The colorability standard ensures that federal courts are not forced to remand claims that are likely to sound in federal labor law simply because the record before the court is not specific enough to pinpoint the exact relationship between the claim and the CBA.

### 4. Plaintiffs' Claims

 Plaintiffs in this case set forth four state law claims related to AFL's refusal to reimburse them for withheld wages: conversion, failure to pay wages under the Maine Wage Payment Statutes, 26 M.R.S.A. §§ 621–A, 626, breach of fiduciary duty, and fraud.[6] With regard to

---

5. In *BIW Deceived* itself, the First Circuit refused to rule on the issue of whether the plaintiff's claims were preempted, stating that "because of the nearly empty record, this Court cannot say with certitude whether it would find ultimately that federal preemption applies in the instant case." *Id.*

6. Plaintiffs also include a request for an accounting as a count in their complaint, but since this is a remedy rather than a claim, the

their claim for failure to pay wages, Plaintiffs argue that AFL's duty to repay their withheld wages arises under the "non-negotiable state law guaranteed right to be paid for work performed," (Mot. to Remand at 7), and therefore is outside the scope of section 301. *See Livadas v. Bradshaw*, 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). Defendants argue in response that "any duty on the part of AFL to pay such wages arose under the CBA." (Mem. in Opp'n to Pls.' Mot. to Remand. at 7.) Although applicability of the CBA to this claim is not yet clear from the present record, the Court nevertheless concludes that plaintiffs' claim for failure to pay wages reveals a colorable federal question under section 301 of the LMRA. *See BIW Deceived*, 132 F.3d at 832.

Maine law requires employers to pay their employees any wages owed within a reasonable time after cessation of employment. In order to state a claim for failure to pay wages under 26 M.R.S.A. § 626, a plaintiff must show that she (1) left her employment and (2) was not paid in full (3) within a reasonable time (4) after making a demand for payment to the employer. *See* 26 M.R.S.A. § 626 (2000).[7] Plaintiffs' Complaint states that they made repeated requests for return of their withheld wages after their employment with Defendant was severed. (*See* Compl. ¶¶ 23–24.) On its face, Plaintiffs' Complaint does not appeal to the CBA between the Union and AFL except to note that the Union approved a CBA that called for the creation of the ESOP. (*See* Compl. ¶ 9.) Plaintiffs maintain that their claims neither arise under the CBA nor do they require interpretation of the CBA. Rather, their action is "a simple state-law wage claim under state law creating minimum labor standards, here, the right to be paid for work performed." (Mot. for Remand at 6.)

■ Defendant rightly points out that the Maine Wage Payment Statutes themselves do not entitle plaintiffs to receive any particular amount of money. Under Maine law, "the employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid." *Bernier v. Merrill Air Engineers*, 770 A.2d 97, 101 (Me.2001). Therefore, Defendant argues, the duty to reimburse Plaintiffs implicates section 301 of the LMRA because it arises under the CBA, not any independent Maine law. Plaintiffs respond that while it may be true that resolution of their claim requires consultation of the CBA in order to determine the amount of wages withheld, it does not require the court to interpret the CBA. Plaintiffs point out that a state law claim requiring mere consultation of a CBA without interpretation does not require the claim to be extinguished. *Livadas*, 512 U.S. at 124, 114 S.Ct. 2068; *see also Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 10 (1st Cir.1999) ("Courts confronted with state law claims must … locate the line between the need for mere consultation of

Court need not address it at this stage of the case.

7. 26 M.R.S.A. § 626 states in relevant part:
 An employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid, provided that any overcompensation may be withheld if authorized under section 635 and any loan or advance against future earnings or wages may be deducted if evidenced by a statement in writing signed by the employee. Whenever the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned. For purposes of this section, the term "employee" means any person who performs services for another in return for compensation, but does not include an independent contractor.

a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims.").

*BIW Deceived's* colorability standard does not require a finding that Plaintiffs' claims do in fact arise under a duty created by the collective bargaining agreement or will in fact require interpretation of the CBA. Only a "seemingly valid or genuine" question as to whether Plaintiffs' claims depend on the meaning of the CBA is necessary. *BIW Deceived,* 132 F.3d at 832. In *BIW Deceived,* the court's finding of jurisdiction over plaintiffs' claim that the union was negligent in conducting job interviews was based solely upon the plaintiffs' acknowledgment that "the union participated in the interview process pursuant to the CBA." From this acknowledgement, and without examination of the CBA itself, the court surmised that "it is plausible (indeed, likely) that the CBA details the nature and limits of the Union's participation in the interview process and that the Union, therefore, would have had a duty of care separate from any duty owed by third parties." *BIW Deceived,* 132 F.3d at 833. Based on this finding that a link to the CBA is "plausible," the court found that plaintiff's negligence claim raised a colorable federal question under section 301.

In the present case, Plaintiffs must prove that they were not "paid in full" by AFL in order to succeed in their claim under 26 M.R.S.A. § 626. At this stage in the proceedings, AFL has not filed its Answer to the Plaintiffs' Complaint. Thus, the Court does not know how AFL intends to dispute this element of Plaintiffs' claim. However, it is impossible to ignore the fact that, generally speaking, the compensation of workers is one of the central issues addressed by the collective bargaining process. It would be surprising if AFL's decision to begin withholding wages occurred without the involvement of the Union, particularly given Plaintiffs' contention that the withholding began before an ESOP was even established. Plaintiffs have submitted an affidavit by the Union's business agent stating that there is no agreement between the Union and AFL that addresses the question of whether AFL was entitled to keep the pay it withheld in the event that the ESOP was not established. (Turkewitz Aff. ¶ 10 ("there is no other agreement between the parties concerning the diverted pay of the drivers, either these four former employees or other drivers, allowing the employer to keep the wages that were to be used to fund the ESOP.").) [8] In defending against Plaintiffs' claim, AFL may well submit evidence that there was in fact some type of agreement between itself and the Union outlining AFL's duty with regard to the allegedly withheld wages. Certainly, the fact that AFL ultimately returned the withheld wages to current employees suggests the possibility that it felt obligated to do because of a prior agreement with the Union with regard to the withheld wages.

In short, this case involves employees subject to a CBA who are suing their employer over the details of a program authorized by the CBA. With facts such as these, the nexus between the CBA and

---

**8.** Defendants argue that this statement in the Turkewitz affidavit constitutes an admission that the CBA does in fact govern the Plaintiffs claims. The Court does not agree. It is clear from the context that Turkewitz is referring specifically to the wage schedules set forth in Article 11 and not any provision that directly addresses the details of withholding wages for the ESOP. Although the wage schedule may require "consultation" at some point in the proceedings, it is unlikely to require any "interpretation" that might trigger section 301 preemption.

Plaintiffs' claim is simply too strong to withstand a test that requires the Court to find only a colorable federal claim. It is at least plausible that Plaintiffs, in litigating the question of whether their wages were truly paid "in full," will be forced to address the relationship between the collective bargaining agreement and the proposed ESOP and, in so doing, will require this court to either interpret the CBA or find that AFL's duty to pay Plaintiffs, if any, is the product of bargaining between the Union and AFL. Therefore, despite sounding in state law, Plaintiffs' claim under 26 M.R.S.A. § 626 raises a colorable federal question under the artful pleading doctrine.[9]

Having concluded that Plaintiffs' Complaint reveals a colorable federal question under section 301 of the LMRA, the Court DENIES Plaintiff's Motion to Remand.

**B. Motion to Dismiss**

Having found a basis for jurisdiction over this matter, the Court turns its attention to Defendant's Motion to Dismiss. When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all of a plaintiff's well-pleaded factual averments and "draw all inferences reasonably extractable from the pleaded facts in the manner most congenial to the plaintiff's theory." *Roth v. United States*, 952 F.2d 611, 613 (1st Cir.1991). The Court may grant a motion to dismiss only if it clearly appears that, on the facts alleged, the plaintiff cannot recover on any viable theory. Fed.R.Civ.P. 12(b)(6); *Gonzalez–Morales v. Hernandez–Arencibia*, 221 F.3d 45, 48 (1st Cir.2000). Applying this standard, the Court ultimately concludes that Defendant's various arguments in favor of dismissal on the basis of preemption are without merit. However, the Court does find that Plaintiffs' fraud claim should be dismissed because it fails to plead the elements of fraud with the particularity required by Fed.R.Civ.P. 9(b).

**1. Section 301 Preemption**

■ In connection with its denial of Plaintiffs' Motion to Remand, the Court has found that Plaintiffs' Complaint raises a federal question since it is "plausible" that the CBA will govern the outcome of this case. In order to dismiss Plaintiffs' claims outright on the basis of preemption, the Court cannot simply conclude that resolution of Plaintiffs' claims could "plausibly" turn on the CBA. Rather, the Court must find that there is "a real interpretive debate" between the parties over the terms of the CBA. *Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir. 1997). In short, nothing in the Plaintiffs' Complaint or the CBA conclusively demonstrates such an interpretive debate. Therefore, it would not be proper for the Court to dismiss Plaintiffs' claims based on the current record.

The first prong of *Flibotte* requires a finding of preemption if it can be shown that the duty allegedly breached by the defendants arose under the collective bargaining agreement. This test is primarily aimed at plaintiffs seeking to recharacterize a claim for breaching the CBA as a tort claim. In *United Steelworkers of America v. Rawson*, 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990), the case cited by the *Flibotte* court in support of this prong, a union was sued in tort for negligently

---

**9.** It is unnecessary to address whether Plaintiffs' other claims raise federal questions since this Court may assert supplemental jurisdiction over them. See *BIW Deceived*, 132 F.3d at 833 ("A federal court that exercises federal question jurisdiction over a single claim may also asset supplemental jurisdiction over all state-law claims that arise from the same nucleus of operative facts.")

performing safety inspections. Although the union was obligated to participate in these inspections pursuant to its CBA, the Idaho Supreme Court found that the negligence claim against them was not preempted because once it undertook the inspection, it was obligated to perform the inspection using reasonable care. The Supreme Court reversed, finding that the scope of the union's duty was governed by the CBA since plaintiffs were not alleging that the union breached "a duty of reasonable care owed to every person in society." 495 U.S at 371, 110 S.Ct. 1904.

In this case, Defendant attempts to characterize Plaintiffs' claim under the Maine Wage Payment Statutes as a de facto breach of AFL's duty under the CBA to pay Plaintiffs' at the wage rates set forth in Article 11. They note that "the CBA sets forth all of the party's rights and obligations with respect to the payments of wages." (Mot. to Dismiss at 11). Plaintiffs counter that the right to be paid wages earned is a non-negotiable state law right under the Maine Wage Payment Statutes and thus outside the scope of section 301. Defendants in turn cite *Bernier v. Merrill Air Engineers*, 770 A.2d 97 (Me.2001) for the proposition that section 626 does not, by itself, create any duty to pay wages in absence of the collective bargaining agreement. According to *Bernier*, "the employment agreement, not section 626, governs how wages are earned." 770 A.2d at 101. Thus, defendants argue, section 626 should be understood as concerned only with the *timing* of payment and not the substantive right to be paid for wages due.

The Court does not think that *Bernier* can be construed as suggesting that sec-

tion 626 is concerned only with the timing of wage payments. In that case, the Law Court upheld a lower court's ruling that applied section 626 to treble plaintiff's damages only after interpreting the employment contract to resolve a dispute over the employer's obligation to pay sales commissions to the employee. *Id.* While the case certainly suggests that interpretation of the employment contract may be necessary to resolve the question of whether wages are in fact due, it was a case in which terms of the employment contract were clearly in dispute. Bernier's claim cannot fairly be characterized as a claim over the timing of his employer's payment of wages. Rather, it was a claim over his employer's refusal to acknowledge that it owed him any wages at all. The fact that interpretation of the contract happened to be necessary to vindicate his right does not mean that this must always be the case.[10] Nor does it suggest that the statute did not create the right he was attempting to vindicate. In a case in which the terms of an employment contract were either irrelevant or beyond dispute, the resolution of a section 626 claim might depend on facts or legal duties that arise entirely outside the context of the agreement.

Thus, while AFL's alleged failure to pay wages due is undoubtedly at the heart of Plaintiffs' claim under the Maine Wage Statutes, the mere fact that the CBA establishes wage rates does not preempt all cases involving payment of wages under these statutes. Defendant must make some showing that the duties established in the CBA are going to be contested in the case. If both parties agree that the employer had the duty to pay employees at the rates set forth in Article 11, the

---

**10.** Of course, the fact that interpretation of the contract was necessary in *Bernier* would have resulted in section 301 preemption in that case under the second prong of *Flibotte* had the employment contract been a CBA.

However, this should not obscure the fact that interpretation of the employment contract is not inevitable in a Maine Wage Payment Statute claim.

claim can hardly be said to "depend on the meaning of" Article 11. *See Rand v. BIW Corp.*, 2001 WL 127655, *5, 2001 U.S. Dist. LEXIS 23164, *16 (D.Me. Feb. 15, 2001) (finding that a claim does not depend on the meaning of a CBA where there is "no real disagreement" between the parties over the meaning of a term). So far, there is no indication of a substantive dispute between the parties over any identifiable duty in the CBA relating to the allegedly withheld wages. Defendants suggest in their motion papers that they are not obligated to repay these wages. However, this assertion has not yet taken the form of a legal argument since Defendants have not yet answered Plaintiffs' Complaint. Since the exact contours of the underlying dispute between the parties are not yet apparent, it would be premature to find that Plaintiffs' claims implicate a duty under the CBA.

Neither is it clear at this stage that the second prong of *Flibotte*—requiring preemption if the dispute requires the interpretation of the collective bargaining agreement—is implicated by Plaintiffs' claim. Although it may well be that Defendant's duty with regard to the withheld wages, if any exists, is defined by some sort of bargained agreement between the Union and AFL, Plaintiffs' Complaint does not state that this is the case. Plaintiffs' Complaint mentions the CBA only in passing—to note that it called for the ESOP's creation. Although this fact might invite preemption had Plaintiffs sued AFL for failing to create the ESOP, it has little relevance to the question of whether AFL must return Plaintiffs' wages. The only other term of the CBA that addresses the ESOP is the provision in Article 20, which removes disputes about the ESOP from the CBA's grievance procedure. Although AFL asserts that the Court will have to interpret this provision to resolve Plaintiffs' claims, Plaintiffs aver that the ESOP

was never created. Thus, unless the AFL can demonstrate that this dispute is over an ESOP that actually existed rather than AFL's unrealized plans to create an ESOP, the provision in Article 20 regarding the ESOP would seem to be irrelevant to Plaintiffs' claims.

In short, based on the very limited record now before the Court it is premature to find Plaintiffs claim under the Maine Wage Payment Statutes to be preempted. Even if the CBA itself is considered, as Defendant suggests it should be, the lack of any provisions dealing with the withholding of wages suggests at least the possibility that plaintiffs could succeed in their claim without requiring the Court to interpret the CBA or any other agreement between the AFL and the Union.

▮ Similarly, Plaintiffs' claims for conversion and breach of fiduciary duty do not on their face implicate a duty under the collective bargaining agreement. Under Maine law, a claim of conversion requires the plaintiff to show that (1) the defendant took possession of plaintiff's property, in this case, Plaintiffs' wages, (2) plaintiff has a property interest in the wages—that is, that she owned the wages or had another interest in the wages that entitled her to possess the wages to the exclusion of the defendant, (3) plaintiff had the right to possess the wages at the time it was taken, and (4) plaintiff demanded that that the wages be returned to her but the defendant refused to return the wages. *See Withers v. Hackett*, 1998 ME 164, 714 A.2d 798 (1998). The question of whether Plaintiffs had a property interest in their "contributions" to the ESOP could well depend upon the meaning of the collective bargaining agreement. However, if there is no agreement between AFL and the Union addressing the question of whether AFL is entitled to keep these withheld

wages, resolution of plaintiffs claims could turn solely on the question of whether AFL breached a common law duty by unlawfully taking possession of plaintiff's "contributions."

 A claim of breach of fiduciary duty requires plaintiff to show that (1) the plaintiff placed trust and confidence in the defendant, (2) there was a great disparity of position and influence between the parties and favoring the defendant, (3) the defendant engaged in or allowed transactions favorable to the defendant or a third party and adverse to the plaintiff in the course of their relationship, and (4) plaintiff has damages proximately caused by the defendant's breach of fiduciary duty. *See Stewart v. Machias Savings Bank,* 762 A.2d 44, 46 (Me.2000). The question of whether Defendant's decision to retain the money withheld for the ESOP was "adverse to the plaintiff" may turn on the interpretation of an agreement between the Union and AFL. However, neither Plaintiffs' Complaint nor the CBA suggests that there is any such agreement. Without knowing how AFL intends to defend against this charge, it is impossible to say with any certainty that either a duty arising out of the CBA is implicated or that interpretation of the CBA will be required.

The Court may yet determine that section 301 preempts Plaintiffs' claims. In fact, for the same reasons that Plaintiffs' claims present a colorable federal question, Plaintiffs may have difficulty demonstrating that their claims can be resolved without any interpretation of the CBA or any other agreements struck between AFL and the Union regarding the proposed ESOP. However, in a motion to dismiss the question is only whether there is "any viable theory" under which Plaintiffs can recover given the facts that they have alleged. Notwithstanding the existence of the CBA, it may turn out that Plaintiffs are able to prove facts that entitle them to relief since there is nothing in their claims or in the CBA itself establishing that their claims depend upon the meaning of a collective bargaining agreement and are therefore preempted. Faced with both possibilities, the Court must deny Defendant's request to dismiss based on LMRA preemption and allow Plaintiffs an opportunity to develop their case via discovery.

## 2. ERISA Preemption

AFL also argues that Plaintiffs' claims should be dismissed because they "relate to" an employee benefit plan and are therefore preempted under ERISA. The employee benefit plan in question in this case is the proposed ESOP.

ERISA, by its terms, preempts "all state laws insofar as they ... relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has cast the net of ERISA preemption widely, holding that "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan" *Shaw v. Delta Air Lines,* 463 U.S. 85, 96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *see also Aetna Health Inc. v. Davila,* —— U.S. ——, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004).

Defendants cite a number of cases in which courts have applied ERISA preemption to claims that involve misrepresentations made prior to the creation of an ESOP. *See Davies v. Centennial Life Ins. Co.* 128 F.3d 934 (6th Cir.1997); *Elmore v. Cone Mills Corp.* 23 F.3d 855 (4th Cir. 1994); *Childers v. Northwest Airlines, Inc.,* 688 F.Supp. 1357 (D.Minn.1988). While these cases suggest that ERISA preemption is broad in scope, they do not suggest that it can extend to proposed benefit plans that were never in fact created. Though it is true that the challenged

behavior at issue in *Davis, Elmore,* and *Childers* occurred prior to the creation of the benefit plans, all of those cases involve an employee benefit plan that eventually came into existence. As a result, these cases are distinguishable from the case currently before the Court.

 Plaintiffs' claims simply cannot be said to "relate to any employee benefit plan" when Plaintiffs specifically aver that such a plan was "never finalized or created as a matter of law." [11] The problem with Defendant's argument is not that Plaintiffs' claims here do not "relate to" to the proposed ESOP. They clearly do. The problem is that the proposed ESOP, standing alone, does not appear to even fit within ERISA's definition of "employee benefit plan." Section 3 of ERISA defines an employee benefit plan as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both...." 29 U.S.C. § 1002(1). If Plaintiffs' averment that AFL's plan was never created as a matter of law is accepted as true, AFL's plan was not "established or maintained" and is therefore not subject to ERISA. To hold otherwise would unduly expand the scope of ERISA preemption and disregard the "starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

In addition, AFL's argument that a mere proposal to create an ESOP preempts state law claims such as fraud, conversion and breach of fiduciary duty even when the proposed plan is never created seeks to transform ERISA preemption from a device to ensure the application of a uniform federal law of benefit plans into a shield for unscrupulous employers. Under AFL's theory, an employer could shield itself from liability for fraud or even conversion by simply announcing its intention to withhold employees' wages for a proposed pension fund or stock ownership plan. Even if the employer had no intention to ever create such a plan, ERISA preemption would shield it from any legal liability for misusing the withheld wages. Such a rule would neither comport with the statutory language of ERISA nor further Congress's purposes in enacting it.

### 3. Fraud Claim

 Finally, AFL specifically argues that Plaintiffs' fraud claim against AFL should be dismissed because it fails to plead all the elements of fraud "with particularity" as required by Fed.R.Civ.P. 9(b).[12] AFL is correct in this contention. Plaintiffs' complaint does plead all the elements of fraud (*see* Compl. ¶¶ 36–40), but the averments lack the necessary particularity. Although the Court is obligated to

---

**11.** AFL is free to challenge this averment in later proceedings, but this may prove difficult given their admission to Plaintiffs prior to the start of these proceedings that "AFL never adopted an ESOP or an associated Employee Stock Ownership Trust." (Marsh Aff. Ex. B.) Although AFL chastises Plaintiffs in its brief by suggesting that they "cannot have it both ways" with regard to ERISA preemption, the same might be said with regard to AFL's denial that a plan existed when Plaintiffs attempted to recover benefits under plan proce-

dures and subsequent argument that the Plaintiffs claims should be preempted under ERISA.

**12.** Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

accept as true all of a plaintiff's well-pleaded factual averments and "draw all inferences reasonably extractable from the pleaded facts in the manner most congenial to the plaintiff's theory," *Roth v. United States,* 952 F.2d 611, 613 (1st Cir.1991), the averments in a fraud case must be specific. According to the First Circuit, "Rule 9 requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980). Thus, "a fraud count [that] is almost wholly conclusory, and ... lacking in specifics.... is too vague to meet the Rule 9(b) benchmark." *Powers v. Boston Cooper Corp.,* 926 F.2d 109, 111 (1st Cir. 1991).

▮ Under Maine law, a person is liable for fraud if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on the representation, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it, causing him economic loss. *Glynn v. Atlantic Seaboard Corp.,* 728 A.2d 117, 119 (Me.1999). Plaintiffs have plead that:

37. The Defendant falsely represented to the Plaintiffs in June 2003 that they would be reimbursed all monies that they had paid towards the stock plan.

38. The Defendant made such representation either with knowledge that it was false or with reckless disregard for whether it was true or false.

39. The Defendant made such representation for the purpose of inducing Plaintiffs to rely upon it.

40. The Plaintiffs justifiably relied on the Defendant's representation as true and acted upon it to their damage.

(Compl.¶¶ 36–40.) Plaintiffs' averments regarding AFL's fraudulent intent comport with the First Circuit's teaching that the circumstances and evidence regarding fraudulent intent may be pleaded generally. *See McGinty,* 633 F.2d at 228. However, their averment that AFL falsely represented to Plaintiffs in June 2003 that they would be reimbursed lacks specificity as to the "time, place, and content" of the misrepresentation. *Id.* at 228. Part of the purpose of Rule 9(b) "is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *American Town Center v. Hall 83 Assoc.,* 912 F.2d 104, 109 (6th Cir.1990). In this case, Plaintiffs' vague averment as to the circumstances surrounding the alleged misrepresentation, which does not specify a place or any specific circumstances under which the statement was made beyond the general time frame, does not give AFL sufficient notice of the substance of Plaintiffs' claim.

Defendant also suggests that the claim should be dismissed because there is no action that Plaintiffs could have taken in reliance on Defendant's alleged representation because Plaintiffs were not employed with AFL at that time it was made. Plaintiffs respond that they refrained from bringing a lawsuit based on that representation and that they were damaged when the other AFL employees were reimbursed. Presumably, Plaintiffs are suggesting that a lawsuit filed sooner would have pressured AFL to reimburse Plaintiffs along with its current employees. While such facts, if proven by clear and convincing evidence, would constitute detrimental reliance, Plaintiffs must plead these facts with greater particularity and clarity as well.

## III. Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' Motion to Remand (Docket # 7) and DENIES IN PART Defendant's Motion to Dismiss (Docket # 5). The Court GRANTS IN PART Defendant's Motion to Dismiss without prejudice insofar as it seeks dismissal of Plaintiffs' fraud claim. If Plaintiffs choose to amend their complaint they shall comply with Fed.R.Civ.P. 15(a).